**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| United States of America, | ) |
| | ) |
| **Respondent,** | ) |
| v. | )   **Case No. 97-CR-171-JHP** |
| | ) |
| Jeffrey Dan Williams, | ) |
| | ) |
| **Petitioner.** | ) |

## OPINION and ORDER

Jeffrey Williams pled guilty in 1998, to federal drug and firearm charges. The record reveals Williams has steadfastly attempted to withdraw his plea of guilty alleging actual innocence and that his plea was coerced and based upon fabricated evidence and perjured testimony.

## PROCEDURAL BACKGROUND

The undisputed procedural background is set forth in this Court's February 27, 2012, Order granting Williams discovery and appointing counsel as follows:

On November 6, 1997, the grand jury for the Northern District of Oklahoma returned a four Count Indictment. Defendant was charged with (1) one count of conspiracy to possess with intent to distribute methamphetamine, conspiracy to manufacture methamphetamine, and conspiracy to maintain various locations for manufacturing methamphetamine; (2) two counts of possession with intent to distribute methamphetamine; and (3) one count of knowingly carrying a firearm during drug trafficking. Defendant contends the Indictment was primarily based on two

1

state court cases.  Specifically, Defendant alleges Counts 2, 3 and 4 involved the state court cases which supported the conspiracy charge in Count 1.[1]

Defendant pled not guilty, and filed three Motions to Suppress on December 15, 1997 (Dkt.#s 5, 6, & 18).  A total of four Indictments were filed, the original and three Superseding Indictments (Dkt.#s 1, 9, 42 , & 140).  Defendant plead not guilty to each Indictment. Defendant contends, however, that after pleading not guilty on May  18, 1998 (Dkt. # 144) to the Third Superseding Indictment, his counsel advised him "if he did not plead guilty, the government intended to file a Fourth Superseding Indictment, adding CCE and including Petitioner's little sister on the Indictment. Petitioner gave up and agreed to plead guilty." (Dkt.# 542 at 16). Defendant entered a guilty plea on May 21, 1998 and sentencing was set for September 15, 1998. (Dkt.# 144).

Subsequently, the Presentence Report ("PSR") was completed by the United States Probation Office of the Northern District of Oklahoma.  Defendant filed objections to all of the enhancements, including the drug quantity calculation.  On August 31, 1998, Defendant filed a Motion to Withdraw his plea (Dkt.# 233).  This motion was denied by the Honorable H. Dale

---

[1] Defendant asserts; "On March 12, 1997, Tulsa Police, Special Investigation Division (SID) officers John K. Gray and Harold Wells, with other officers, with no warrant and no probable cause, conducted an illegal search and seizure of Petitioner which resulted in State Case No. CF-1997-1314, that later became Count 2, of Petitioner's federal indictment.

On July 11, 1997, a state preliminary hearing was held regarding the March 17, 1997, illegal arrest in Case No. CF-1997-1314, where Officer John K. Gray lied under oath, which is supported by the record, and Petitioner testified that officer John K. Gray lied.

On July 22nd, 1997, just eleven days after the preliminary hearing, officers John K. Gray and Jeff Henderson, with other officers, including William Yelton, retaliated against Petitioner, and conducted a "second" warrantless search and seizure, with no probable cause, which resulted in State Case No. CF-1997-3590, that later became Counts 3 and 4 of Petitioner's federal indictment.

On November 6, 1997, Petitioner's first federal indictment was filed charging four Counts.  As stated above, Counts 2, 3 and 4 were from the two illegal searches and seizures conducted by the above referenced SID officers."  (Defendant's motion at 2-3, Dkt.# 542).

Cook on September 10, 1998 and Defendant's sentencing was continued until November 19, 1998) (Dkt. # 239).  On November 13, 1998, Defendant filed a Motion to Reconsider his Motion to Withdraw Guilty Plea (Dkt.# 276).

On November 19, 1998, Defendant appeared for sentencing. Counsel first reurged Defendant's Motion to Withdraw Guilty Plea.  This motion was denied.  Counsel next argued the drug quantity was incorrect.  The Government presented the testimony of DEA Agent Leon Frances to support the drug quantity calculations. Agent Frances based his calculations on statements of informants, stating that one of the informants, Gregg Fillmore, stated Defendant was responsible for 385 ounces.  During allocution, Defendant alleged the following:

> Defendant: I apologize for being a burden, Your Honor, but the information that the government has gathered has all been based on co-defendants' testimony or witness testimony.  At no time have I made a statement or a comment admitting to any of this except for entering a plea agreement that I didn't want to enter in the first place.

> Gregg Fillmore, one of the witnesses, that the codefendant – or the government is saying is responsible for like 380 ounces, I've never met that person in my life.  I don't even know who he is.

> Now, the rest of those people I know them, but I have no idea who that person is. So how can this information be true or accurate when I've never met this man in my life  (Sentencing Tr. at 21-22).

The Honorable H. Dale Cook denied Defendant's Motion to Withdraw Guilty Plea and sentenced Defendant to 360 months as to Counts 1, 2, and 3 and 60 months of consecutive imprisonment for Count 4.  Judgment was entered on December 4, 1998 (Dkt. # 283).

Defendant filed a direct appeal four days later on December 8, 1998 (Dkt.# 286).  The Tenth Circuit Court of Appeals denied the appeal and affirmed the decision of the District Court on January 25, 2000 (Dkt.# 335).  Thereafter, Defendant filed a Petition for Certiorari which was denied on May 23, 2000 (Dkt.# 345).

On January 4, 2001, Defendant filed a Motion to Vacate pursuant to 28 U.S.C. § 2255 (Dkt.# 365).  Defendant raised thirteen ineffective assistance of counsel claims, including several asserting counsel's failure to object to sentence enhancements that allegedly violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  This Court denied relief and the Tenth Circuit Court of Appeals dismissed the appeal.  *United States v. Williams*, 44 F.App'x 443 (10th Cir. 2002), *cert. denied*, 537 U.S. 1138 (2003) (Dkt. # 425). Thereafter, Defendant filed three additional motions which were construed by the Tenth Circuit as requests to file successive §2255 motions (Dkt.#s 432, 446 # 468), and Defendant was denied authorization to file them.

On March 5, 2009, this case was randomly reassigned to this Court for review. [2]

On November 17, 2010, Defendant filed a "Combined Pro Se Request For Discovery, Request For Expansion of the Record, and for an Evidentiary Hearing" (Docket No. 514).  In this motion Defendant claimed "that at least five of the Tulsa Police Officers who have either been indicted, pled guilty, or are awaiting trial, as a result of the grand jury corruption probe, were involved in the investigation of Petitioner's criminal case, and his arrests.  These officers fabricated and manipulated the evidence, witnesses, and informants, resulting in Petitioner's unconstitutional indictment, guilty plea and unjust 35-year sentence." *(Defendant's Br. At 2-3).*[3] Defendant noted that if he "would have had proof of the officers corruption, at that time, he would have received a substantially lower sentence.  As it stands, Petitioner's conviction and sentence constitute a fundamental miscarriage of justice." *Id.*

---

[2]  The instant case was initially assigned to Senior Judge H.D. Cook on November 6, 1997.  On March 4, 2009, this case was randomly reassigned to Chief Judge Claire V. Eagan (Docket No. 478). On March 5, 2009, this case was again randomly reassigned to this Court for review (Docket No. 479).

[3]   Defendant identifies the following four officers as being involved in his case: (1) Officer John K. Gray; (2) Officer Harold Wells; (3) Officer Jeff Henderson; and (4) Officer William Yelton.

Petitioner also again attacked the credibility of Greg Fillmore, one of the witnesses that DEA Agent Francis interviewed in determining the drug quantity attributable to Williams. Williams contends Officers Henderson, Wells and Gray used undue influence to persuade Gregg Fillmore to provide evidence to law enforcement.   Specifically, Williams contends Gregg Fillmore was charged by Information in The District Court of Tulsa County, Oklahoma, on July 1, 1993, with Murder in the First Degree.  Williams contends this charge was dismissed on April 14, 1994, in exchange for Fillmore's cooperation as an informant.   Williams contends the evidence supplied by Fillmore was fabricated and resulted in a gross exaggeration of the drug quantity attributable to him as additional relevant conduct at sentencing.  In support of this motion, Williams included the following:

(1) District Court of Tulsa County, Oklahoma records establishing the charge filed against Gregg Fillmore for First Degree Murder, and the ultimate dismissal of that charge.

(2) A notarized statement from his sister, Susan Weatherman, claiming that she went to Fillmore's home, escorted  by a Claremore police officer, and confronted  Fillmore. Ms. Weatherman stated she "informed Mr. Fillmore that [she] was in possession of statements from various persons indicating that he had provided information to police about Jeff Williams, [her] brother, that was not true. [She] informed him that [she] knew he was a false informant and that he didn't even know [her] brother."  Fillmore could not identify Williams.  Further,  Ms. Weatherman asked Fillmore to sign a statement, and told him she "just needed him to tell the truth."  She alleges when Fillmore read the statement "he became very agitated and cut us short. He said he would think about it and let me know in a couple of days."  Ms. Weatherman told Fillmore she would contact him through the Claremore Police Department.

5

After they left Fillmore's house, Ms. Weatherman states the officer told her  "he felt like [Fillmore] might make the statement to keep me quiet about his wife's unsolved murder or that he might not for that very same reason because of consequences if he told ..."   Ms. Weatherman states that when she contacted the Claremore Police Department, three days later, officers would not speak with her regarding Fillmore because they had received information that Fillmore was currently under witness protection with the United States Attorney's  Office.  Ms. Weatherman concluded that "[s]ince April 4, 2011 when [she] spoke to Gregg Fillmore [she] had received two threatening phone calls.  They were on [her] cell phone which is not listed.  She stated, "I do not know who it was either time or how they got my number but it was a male voice and the first call said "You need to keep your F...ing nose out of peoples' business if you know what's good for you and the second call was "You better watch your F...ing back."

(3) A notarized statement from a woman named Stephanie Stutsman-Dickens claiming that Fillmore stated in her presence that he did not know Williams and had provided information regarding drug quantities to prevent officers from pursuing him for the murder of his wife.

(4) A notarized letter from a woman named Aubrey Ferrell, claiming that Fillmore had asked her to introduce him to Jeff Williams.  Ferrell also asserts that Fillmore had told her he was an informant for the Tulsa Police Department's Special Investigations Division.

(5) A notarized statement from a woman named Tara Moles, claiming that Fillmore tried to convince her to testify falsely at an unrelated murder trial, and told her "police wanted him to say that because they could get the death penalty."  Moles also alleged that Fillmore pressed her to introduce him to Williams.

 Defendant cited *United States v. Bryant*, 892 F.2d 1466 (10th Cir. 1989) for the proposition that a "sentencing based on consideration of 'materially untrue' information is

'inconsistent with due process of law' ... defendant has a constitutional right to sentencing based on accurate information." *Id.* at 1471; *(Defendant's Br. at 3).* Defendant also cited *United States v. Sunhodes*, 831 F.2d 1537 (10th Cir. 1987), " [T]he Fifth Amendment Due Process Clause applies to sentencing proceedings ... Due process insures that a defendant will not be sentenced on the basis of misinformation of a constitutional magnitude ... we recognize a due process right to be sentenced only on information which is accurate." *Id.* at 1541-42; *(Defendant's Br. at 3).* Defendant asserted that in light of this newly discovered evidence he either would not have pled guilty and  proceeded to trial, or he would have received a substantially lower sentence, [and] with a 15-year sentence, with good time, [he] would have completed his sentence about 2-years ago, with no halfway house." *(Defendant's Br. at 9).* This motion was deemed a successive petition and denied by the Tenth Circuit Court of Appeals on July 25, 2011, Case No. 11-5081 (Dkt. # 533).

Since the denial of Petitioner's motion at least one of the officers Petitioner contends was involved in his arrest has been convicted on eight of 53 counts.  Count 45 in the Indictment charged Officer Jeff  Henderson with violating the civil rights of an individual and the remaining counts involved instances of perjury related to Count 45.  Further, the Court takes judicial notice that at least 42 persons have been freed from custody, had a felony case dismissed, a sentence modified, or a new trial granted in the aftermath of the Tulsa police corruption investigation.

On January 17, 2012, Defendant filed the instant Motion to Withdraw and Nullify Guilty Plea (Dkt.# 542).  The Government filed a Response to said motion on February 1, 2012.  In this motion Defendant set forth new allegations of misconduct on the part of Tulsa police officers including specific allegations of fraud committed upon this court.  *See supra n.* 1.  Defendant requested that the  motion be construed liberally, because pursuant to Tenth Circuit case law "a

pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009).   Although Defendant characterized the motion as a Motion to Withdraw and Nullify Guilty Plea, the Court found in the face of the current newly asserted allegations it was more properly and liberally construed as a motion asserted  pursuant to Fed.R. Civ.P. 60(d)(3) alleging a fraud upon this Court.  *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238 (1944). (Dkt.# 548).   Therefore, Defendant was appointed counsel and the parties were granted sixty days to engage in discovery, subject to an agreed protective order if necessary. (Dkt.# 548).

The Government filed a Motion to Reconsider, (Dkt.# 551), which was denied on March 22, 2012. (Dkt.# 553).   Thereafter, the Government filed a Petition for Extraordinary Writ of Mandamus with the Tenth Circuit Court of Appeals which was denied by the Circuit Court on May 3, 2012. (Dkt.# 566).   Accordingly, at the conclusion of the discovery period, this Court conducted several days of evidentiary hearings in regard to this matter.

## EVIDENTIARY HEARING COUNTS 2, 3, AND 4

## WILLIAMS' MOTION TO WITHDRAW AND NULLIFY GUILTY PLEA

As stated *supra*, Williams alleges that on March 12, 1997, John Gray, Harold Wells, and other officers, conducted an illegal search and seizure of Williams which resulted in State Case No. CF-1997-1314. This incident later became Count 2, of Williams federal indictment. **On July 11, 1997, Williams accused John Gray of lying under oath during the State preliminary hearing for Case No. CF-1997-1314.** Further, Williams contends that on July 22, 1997, John Gray, Jeff Henderson, and other officers, retaliated against Williams by conducting a second

warrantless search and seizure, which resulted in State Case No. CF-1997-3590. The search in State Case No. CF-1997-3590 led to Counts 3 and 4 of Williams' federal indictment.

In support of his Motion, Williams includes, among other exhibits, a copy of the July 11, 1997, State Preliminary Hearing Transcript. Williams alleges John Gray's testimony during the State preliminary hearing regarding a controlled buy was false.  Specifically, Williams asserts Gray and the other officers committed *Brady* violations and engaged in unconstitutional and illegal conduct by "manufacturing evidence and lying under oath."

At sentencing, Williams' attorney challenged the drug quantity, asserting the only reliable drug quantity **was 37.4 grams** from the two unconstitutional and illegal Tulsa arrests. Williams specifically informed the sentencing Court, during allocution, that he did not know one of the informants, Gregg Fillmore, who **attributed 385 ounces** of methamphetamine to him.

During the evidentiary hearings, Williams presented three (3) witnesses who supported the allegations in his motion:

(1) Katherine Lanning testified that on March 12, 1997, the day John Gray testified he conducted a controlled buy from Williams at Lanning's apartment, she was home alone and that no controlled buy occurred. (E.H.T. p. 25);

(2) Eddie Farner, John Gray's informant on March 12, 1997, testified he never conducted a controlled buy for John Gray from Williams. (E.H.T. p. 186-87). John Gray testified  he had no recollection of the case, and could not recall documenting the money used for the controlled buy, or the confidential informant who was alleged to have made the buy. (E.H.T. p. 510-513)[4]; and

---

[4] It should be noted  this was initially a State case, and the State did not file charges against Williams for a controlled buy.

(3) <u>Gregg Fillmore</u>, one of the informants in Williams' case, whose testimony is addressed infra.

The government's only Witness, DEA Agent Leon Francis, admitted during his testimony that he and the AUSA had a conversation regarding the alleged controlled buy and they decided not to use it as an overt act or substantive count in Williams' federal indictment. (E.H.T. p.419). This fact creates grave concerns as to whether Agent Francis knew, or had reason to question, the problems associated with the controlled buy.

Williams' assertion that there was no controlled buy, combined with Lanning's, Farner's and Agent Francis' testimony, the lack of supporting documentation for a controlled buy, and John Gray's lack of credibility, provides clear and convincing evidence there was no controlled buy.

John Gray's partner for the March 12, 1997, search and seizure, Harold Wells, who is currently serving a ten (10) year federal sentence for his part in the recent corruption scandal, lacks credibility in this matter as well. Both Gray and Wells testified they did not remember Williams or anything about the March 12, 1997, search and seizure. (E.H.T. p. 513,  15-16) (E.H.T.  p. 566-570).

From the record before the Court it appears John Gray falsified the search warrant affidavit for Lanning's apartment and committed perjury during the State preliminary hearing regarding the controlled buy. Based on these facts, the Court finds John Gray's entire testimony during the State preliminary hearing unreliable, including Gray's testimony regarding the search and seizure of Williams in the parking lot.  It is evident from Williams' testimony and the testimony of his witness, Marvin McLaughlin, at the State preliminary hearing, that the March

12, 1997, search and seizure of Williams was unlawful.  Gray's testimony lacks sufficient credibility to sustain Williams conviction on Count 2, of his federal indictment.

Lanning further testified that, during the search of her apartment, John Gray produced a bag of methamphetamine which was not in her apartment before the police arrived, and that she believed John Gray was attempting to use the drugs to set up Williams. (E.H.T. p. 24-25). Lanning also testified she never saw Williams manufacture or sell drugs. (E.H.T. p. 23-24). Nothing found during the search of Lannings apartment supports the allegation that she was involved in the manufacture of methamphetamine: no glassware, chemicals or other items associated with manufacture or distribution were recovered.

Regarding the July 22, 1997 arrest, Lanning testified that after Williams was instructed to exit the vehicle, a third passenger, "Skip" Owens, became very nervous and agitated because he was in possession of a firearm. Lanning further testified Owens removed the firearm from the waistband of his pants, and she told him to put it back. (E.H.T.p.28)  Lanning told the officers the firearm belonged to "Skip" Owens (E.H.T. p. 29-30).  She further testified the officers coerced her into stating that the firearm belonged to Williams, even though she knew it did not. (E.H.T. p. 29-30). Officers present at the scene included John Gray and Jeff Henderson.  Both of whom have been found guilty of and/or admitted to corruption and various civil rights violations.

DEA Agent Leon Francis testified that Williams and Lanning stated the gun belonged to "Skip" Owens at the time of the search and seizure. (E.H.T. p. 215). Francis further testified that, other than "Skip" Owens, of the seventy persons or so interviewed, he could not remember anyone stating they ever saw Williams with guns. (E.H.T. p. 390).

Based on Williams' sworn Affidavit, attached as Exhibit J to his Motion, and the testimony of Lanning and Agent Francis, it is evident Williams had no history of firearms

possession and was not in possession of the firearm.  The Court further finds the allegations in Williams undisputed Affidavit (Exhibit J), are true, and that John Gray, Jeff Henderson, and other SID officers, conducted an unconstitutional and illegal search and seizure of Williams on July 22, 1997, which resulted in Counts 3 and 4 of Williams' federal indictment.

For the reasons stated above, the Court sets aside Williams' convictions on Counts 2, 3, and 4, and dismisses those Counts.


## Count 1

Eddie Farner testified that starting in 1994, he worked with officers John Gray, Harold Wells, and Jeff Henderson, delivering drugs for them and setting up contacts "so they could raid and bust others." (E.H.T. p. 156). Farner testified he distributed drugs in small quantities for these officers, (E.H.T. p. 157), until 1999. (E.H.T. p. 162).  According to Farner, these officers drove him to a remote location in Sand Springs and threatened to kill him if he ever discussed their illegal activities. (E.H.T. p. 164). The Court finds such testimony consistent with statements provided to prosecutors and federal agents in the general police corruption scandal.

During cross-examination, Farner testified he had not seen Williams manufacture methamphetamine, (E.H.T. p. 171), and denied seeing Williams manufacture methamphetamine at A-Tow Trucking shop. (E.H.T. p. 172).  Farner also testified he had no knowledge of people receiving drugs from Williams at the A-Tow Trucking shop. (E.H.T. p. 174).

Farner's testimony supports Williams' allegations that the officers in question were engaging in unconstitutional and illegal conduct in 1997, when they arrested Williams, and that Farner had no personal knowledge of Williams manufacturing methamphetamine.

Gregg Fillmore, one of the informants in Williams' case, testified he was pulled over by a deputy sheriff, even though he had not committed a traffic violation, and that he was handcuffed and his vehicle searched. (E.H.T. p 49). Fillmore testified the deputy produced a marijuana pipe which was not in Fillmore's vehicle before the search. (E.H.T. p. 49-50). Fillmore further testified the deputy addressed him by name, that he was aware Fillmore knew Williams, and that someone would be there in a few minutes to talk with him. (E.H.T. p. 49-50). Fillmore testified a short time later a plain clothes officer arrived in a small red truck. Fillmore stated the officer was aware that he knew Williams. The officer gave Fillmore a phone number and instructed Fillmore to call the number. (E.H.T. p. 50).

Fillmore testified later that evening a black male identifying himself as a federal agent came to Fillmore's home. (E.H.T. p. 51). Fillmore described the black male as being 6'2" or 3", with a muscular build. (E.H.T. p. 65). Two subsequent witnesses testified that, during the time frame in question, John Gray had a large black male partner that fit Fillmore's description. (E.H.T. p. 481-82 and 542).

According to Fillmore, the large black male officer instructed Fillmore to call the number given to him by the previous officer. Fillmore alleges he was told to tell the person he called specific lies regarding the manufacture of methamphetamine in the presence of Williams. (E.H.T. p. 51). Fillmore testified he agreed to cooperate because the large black male officer threatened his life, and told him he could be re-charged with the murder of his wife. (E.H.T. p. 52-53). Fillmore testified he called the number provided to him the following day, as instructed. (E.H.T. p. 63). Fillmore testified that DEA Agent Leon Francis' partner, Agent Hochfelder, answered the call and said, "Good, you did call." (E.H.T. p. 69). Fillmore stated it was clear they were expecting his call. (E.H.T. p. 69).

Fillmore's testimony suggests there was more than a casual connection between the officers who threatened coerced and coached Fillmore.  It indicates the officers were in contact, and working with, agents Hochfelder and Francis.

During the hearing, Fillmore recanted his original statement. He testified he never saw Williams manufacture methamphetamine. (E.H.T. p. 48, 57 and 104), and he never bought drugs from Williams. (E.H.T. p. 105).

The Court asked Fillmore how the Government came up with the amount of methamphetamine, and Fillmore responded: "I have no idea, sir." (E.H.T. p. 112).

During cross-examination, the government provided Fillmore with a copy of Agent Francis' DEA-6 of his interview with Fillmore.  The government asked Fillmore if he told agent Francis he knew Tracy Scott Wallace and Fillmore stated: "I don't believe so." (E.H.T. p. 72). The government asked Fillmore about another name listed in Fillmore's DEA-6, and Fillmore replied: "I don't believe I know an Eileen Farmer," and, "I don't know an Eileen Farmer plain and simple." (E.H.T. p. 73-74).

Agent Francis testified Fillmore and Williams "broke contact in August of '95, and Eileen Farmer did not meet Mr. Williams until January of '96, so the time frames were totally separate." (E.H.T. p. 323).

Based on the testimony of Fillmore and agent Francis, it is evident Eileen Farmer's name should not have been referenced in Fillmore's DEA-6.

After being asked by the government to read his DEA-6, Fillmore testified: "Ma'am, I don't know where this stuff came from, but I don't recall ever saying any of this." (E.H.T. p. 74).

The government asked Fillmore repeatedly if Agent Francis would be lying if he testified that Fillmore made the statements in his DEA-6, and Fillmore answered "Yes", each time.

(E.H.T. p 77-80).   Even though the government had the means and opportunity, in lieu of calling the actual witnesses, the government elected to call one witness, DEA Agent Leon Francis.

Agent Francis testified he did not know how he and his partner, Hochfelder, came into contact with Fillmore, (E.H.T. p. 310), he had no idea how Fillmore knew to contact them, (E.H.T. p. 312), and that not a single one of the more than 70 persons interviewed mentioned the name Gregg Fillmore. (E.H.T. p. 311).

Francis testified Fillmore literally walked in off the street and implicated himself in the conspiracy, (E.H.T. p. 315), and Fillmore did not ask for anything in exchange for his cooperation. (E.H.T. p. 316). Francis also testified that Fillmore "didn't want to snitch on anybody," (E.H.T. p. 318-19), and that despite these unusual circumstances, Agent Francis did not believe that Fillmore's motivation was important in assessing his credibility. (E.H.T. p. 315-16).

The testimony of Agent Francis proves that Francis did not question Fillmore about his knowledge of the manufacturing process, (E.H.T. p. 327), that he did not ask Fillmore if he knew what chemicals were necessary to manufacture methamphetamine,(E.H.T. p. 330-31), or the simple question of whether Fillmore could provide a description of Williams. (E.H.T. p.441).

Francis' testimony proves he made absolutely no independent effort to corroborate Fillmore's story. Fillmore's version of the facts was so unbelievable it is hard to believe an experienced DEA agent like Francis would accept it at face value and not attempt to find some independent corroborating evidence.

The Court finds the testimony of Mr. Fillmore to be credible. The Court finds the testimony of Agent Francis to be unreliable. Based on the testimony of Gregg Fillmore, Agent Francis was expecting Fillmore to call. It is further evident Agent Francis was aware that

Fillmore's statements were false. It is equally clear the information in Agent Francis's DEA-6 was fabricated, and that Agent Francis was immersed in a fraud that contaminated Williams' entire case.  For these reasons, the Court finds that none of Agent Francis' DEA-6s are sufficiently reliable to support William's conviction on Count 1.

Therefore, in the interest of fundamental fairness and to maintain the integrity of the Court, as well as the trust of the public, the Court finds it necessary to set aside Count 1.

## FRAUD ON THE COURT

The Court's inherent power to set aside a judgment for fraud on the court is not a new concept, it is a historical duty and obligation. *Hazel-Atlas Glass Co. v. Harford Empire Co.*322 U.S. 238 (1944), and *Universal Oil Prods. Co. v. Root Ref.Co.,* 328 U.S. 575, 580 (1946).  A "federal court has the inherent power…to set aside its judgment if procured by fraud upon the court." *Show v. AAA Eng'g and Drafting, Inc._*, 138 Fed. Appx. 62, 73 (10th Cir. 2005), and there is no statute of limitations for bringing a fraud upon the court claim, *Hazel-Atlas* at 244, because "a decision produced by fraud on the court is not in essence a decision at all and never becomes final." *Kenner v. Comm'r of Internal Revenue*, 387 F.2d 689,691 (7th Cir. 1968).

The "inherent power of the court to set aside its judgment if procured by fraud on the court is not dependent on the filing of a motion by a party; the court may assert this power sua sponte." *United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002).  It "has long been recognized that the public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud…the Supreme Court in Hazel-Atlas found that if a "deliberately planned and carefully executed scheme to defraud'

the court is conclusively established, that the court has the duty and power to vacate its own prior judgment." *Raymark Industries, Inc. V. Steple*, U.S. Dist. LEXIS 6710 (10th Cir. 1990).

"The inquiry as to whether a judgment should be set aside for fraud upon the court…focuses not so much in terms of whether the alleged fraud prejudiced the opposing party, but more in terms of whether the alleged fraud harms the integrity of the judicial process" *Levanders v. Prober*, 180 F.3d 1114,1120 (10th Cir. 1999).   A finding of fraud on the court permits the severe consequences of allowing a party to overturn the finality of judgment. *Kern River Gas Transmission Co. V. 6.17 Acres of Land,* 156 Fed. Appx. 96, 104 (10th Cir. 2005).

In the criminal context, the Court in *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009), agreed that Smiley's fraud on the court motion was not a second or successive petition and "reasoned that the fact the case involved a criminal sentencing process, rather than a civil proceeding such as Hazel-Atlas was inconsequential." Citing, *United States v. Bishop*, 774 F.2d 771, 774 (7th Cir. 1985).  In, *Burke v. United State*s, 2005 WL 2850354 (E.D. Pa. 2005), the Court stated that "petitioner's motion seeking relief from judgment based on fraud upon the court under *Hazel-Atlas*…and as such, is not a second or successive 2255 motion." See also, *Calderon v. Thomas*, 523 U.S. 538,553 (1998), and *United States v. McVeigh*, 2001 WL 619765 (10th Cir. 2001). [5]

The Court's inherent power is supported by the provision of Fed.R.Civ.P. Rule 60(d)(3), commonly known as the "savings clause," states in part that : " This rule does not limit

---

[5] In *United States v. Baker*, 718 F.3d 1204 (10th Cir. 2013), the Tenth Circuit Court of Appeals found the defendant offered no authority to support  his invocation of the Court's inherent power under Rule 60(d)(3) to circumvent the certification requirements of §2255(h).  The instant  case is distinguishable  due to the fact  it is the Court, not the defendant, that has invoked its inherent authority and has construed Williams' Motion to Withdraw and Nullify Guilty Plea as a fraud on the court motion.

the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding…or to set aside a judgment for fraud upon the court." Clearly, Rule 60(d)(3), supports the Court's inherent power to set aside Williams' judgment for fraud upon the court.

The Supreme Court, as long ago as, *Mooney v. Hologan*, 294 U.S. 103, 112 (1935), stated that deliberate deception of a court by the presentation of false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in, *Pyle v. Kansas*, 317 U.S. 213 (1942). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269 (1959). Tampering with the administration of justice in the manner indisputably alleged here involves far more than an injury to a single litigant." It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently within the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." *Hazel-Atlas*, 322 U.S. at 246.

However, the Court is not limited in this matter to its inherent power to grant relief based on fraud on the court. As Williams pointed out in his Motion, The Court has jurisdiction to grant a post-sentence motion to withdraw guilty plea in order to correct a "manifest injustice." *United States v. Espinosa,* 449 F.3d 1301,1307 (10th Cir. 2006) and *Watson v. Wyo*, 83 Fed. Appx. 292, 297 (2003). Williams has presented "clear and convincing" evidence that a "manifest injustice" has occurred, and this Court has a duty and obligation to fashion a remedy and grant appropriate relief, because Williams has made a colorable showing of "actual innocence," supported by newly discovered evidence that was not previously available.

Recently, Williams filed three (3) Supplemental Briefs addressing new case law that has occurred during the pendency of this case. The first brief discusses *United States v. Cortez-*

*Fisher*, 2013 WL 1286985 (4th Cir. 2013).  In *Cortez-Fisher*, the defendant filed a post-sentence motion to withdraw his guilty plea, after belatedly learning that the officer involved in the investigation and prosecution of his case had made false representations on a search warrant affidavit, to include, citing an informant who "had no connection to the case." *Id*. at 2.  The issue in *Cortez-Fisher* was whether the belated disclosure of the officer's misconduct rendered the defendant's plea invalid under the Due Process Clause. *Id*.  The *Cortez-Fisher* court held that, "the officer's affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights."  *Id*. at 1.  In so holding the court pointed out that factual innocence is not a prerequisite for such a finding and that its "decision to vacate Defendant's plea is supported by the important interest of deterring police misconduct."  *Id*. at 8.    This case is factually and legally similar to Williams' case.

Williams' second Supplemental Brief discusses the Supreme Court's recent decision in, *McQuiggin v. Perkins,* 133 S. Ct. 1924 (2013), where the Court held that "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." *Id.* at 1932.  This "fundamental miscarriage of justice" exception is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons. *Id.* See also, *Herrara v. Collins*,  506 U.S. 390, 404 (1993) (suggesting that compelling enough newly discovered evidence might satisfy the freestanding actual innocence threshold).  *Heard v. Addison*, U.S. App. LEXIS 18356 (FN 1) (10th Cir. 2013).  The "miscarriage of justice: exception has been applied to "overcome procedural defaults.  These include "successive" petitions asserting previously rejected claims*."  Perkins* at 1931.  The "miscarriage of justice" exception survived AEDPA's passage.  *Id*. at 1932.  A petitioner invoking the "miscarriage of justice" exception "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 1927.  Williams specifically stated in the second Supplemental Brief that "newly acquired evidence brought forward at the evidentiary hearing supports a claim for actual innocence as to both the firearm charge and other charges."

On August 15, 2013, the government filed its Response to Defendant's Motion for Leave to File Notice of Supplemental Authority, stating in part that: "The United States has no objection to the Court considering the cases discussed in those two pleadings." The government did not object to Williams assertions of actual innocence.

On October 17, 2013 Williams filed a third Motion for Leave to File Notice of Supplemental Authority, discussing the recent decision in, *Larsen v. Soto,* 2013 WL 5066813 (9th Cir. 2013), where the defendant was convicted in 1998 of possession of a dangerous weapon and sentenced to twenty-eight (28) years. The *Larsen* Court clarified that, in order to pass through the "miscarriage of justice" actual innocence "gateway," a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id*. at 9. While this standard permits review only in extraordinary cases, it does not require absolute certainty about a petitioner's guilt or innocence. *Id.* "To be credible, such a claim requires a petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eye witness accounts, or critical physical evidence – that was not presented at trial." *Id*. Quoting, *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). It is sufficient that the new evidence merely casts doubt on the conviction by undercutting the reliability of the proof of guilt, even though the new evidence does not affirmatively demonstrate the petitioner's innocence. *Id*. This is true even where the trial record contains sufficient evidence to support the verdict. *Id.* at 13.

Williams stated in the third supplemental that he "presented sufficient new, credible evidence at the evidentiary hearing to undercut the reliability of the judgment, regardless of whether the record contains sufficient evidence to support the judgment. This is particularly true of the firearm count. Furthermore, the testimony of witnesses at the evidentiary hearing indicates that nothing Agent Francis did is sufficiently reliable to support a finding of guilty on all counts." The government did not file an objection to the case law or the content of the third Supplemental Brief.

"To satisfy the 'fundamental miscarriage of justice' exception, 'a criminal defendant must make a colorable showing of factual innocence.'" *Bowen v. Kansas*, 295 Fed. Appx. 260 (FN2)(10th Cir. 2008). "Prisoners asserting innocence as a gateway to defaulted claims must

establish that, in light of the new evidence, it is more likely than not that no reasonable juror would have found the prisoner guilty beyond a reasonable doubt." *Woodward v. Cline,* 693 F.3d 1289, 1294 (10th Cir. 2012).

Williams has presented newly discovered evidence that was not previously available, has identified numerous constitutional violations that cast doubt on his convictions and undercut the reliability of the proof of guilt.  In light of this new evidence, it is more likely than not that no reasonable juror would have found Williams guilty beyond a reasonable doubt.


## CONCLUSION

For the foregoing reasons, the Court finds it has the inherent power and jurisdiction to grant relief. The facts of this case clearly establish this Court properly and liberally construed Williams' pleading as a fraud upon the court motion. The Court further finds the scheme to manufacture evidence was deliberately planned, carefully executed and intended to defraud this Court, and in fact**,** this Court did rely upon the fraudulently manufactured evidence in order to convict and sentence Williams. As a result of such fraud upon the court, the conviction, sentencing and judgment in Williams' criminal conviction was not, in essence, a decision at all and never became final. This Court finds the fraud discussed herein did harm the "integrity of the judicial process" and the actions of officers and agents harmed the integrity of the judicial process.  Finally, Williams has provided newly discovered evidence that satisfies the miscarriage of justice actual innocence standard. Therefore, this Court has both the duty and the power to vacate its own prior judgment. Accordingly, the Court vacates Defendant's judgment and sentence and dismisses the Indictments.


**IT IS SO ORDERED**   this 18th day of April, 2014.

James H. Payne
United States District Judge
Northern District of Oklahoma